IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOHNSEN AND ALLPHIN PROPERTIES, <br><br> Plaintiff, <br><br> v. <br><br> FIRST AMERICAN TITLE INSURANCE COMPANY, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (DKT. 29)** <br><br> Case No.: 2:12-cv-740-RJS <br><br> Judge Robert J. Shelby |

This case arises from Plaintiff Johnsen and Allphin Properties' purchase of interest in a loan on residential development property in Summit County, Utah. Leading up to the loan purchase, Plaintiff initially reviewed a preliminary title report showing two other liens on the property. But others reassured Plaintiff that the liens were mistaken or invalid, and directed Plaintiff to a title insurance policy Defendant First American Title Insurance Company had issued (the Policy) insuring the loan's first position. The Policy inaccurately failed to list the other two liens. After reviewing the Policy, Plaintiff bought the interest in the loan. Plaintiff soon learned that its loan was not actually in first position—the two other liens were in a superior position. In the aftermath of that discovery, Plaintiff asserted a claim under the Policy for losses allegedly suffered due to holding an inferior position on the loan. When Defendant did not pay the claim, Plaintiff filed suit.

As this case progressed, Defendant formally denied Plaintiff's claim. Plaintiff then filed a Second Amended Complaint, which governs this dispute. (Dkt. 28.) Plaintiff asserts claims for: 1) breach of contract; 2) breach of the covenant of good faith and fair dealing; 3) negligent interference with prospective economic relations; and 4) negligent misrepresentation.

1

Defendant has moved to dismiss all the claims in Plaintiff's Second Amended Complaint under Rule 12(b)(6), Federal Rules of Civil Procedure. (Dkt. 29). On July 22, 2013, the court heard argument on Defendant's motion. Brennan H. Moss and Nathan S. Dorius appeared on behalf of the Plaintiff. Mark O. Morris and Michael A. Gehret appeared for the Defendant. Based on the parties' briefing and argument, the court ruled from the bench as follows:

1) The court DENIED without prejudice Defendant's Motion to Dismiss Plaintiff's claim for breach of the covenant of good faith and fair dealing;

2) The court GRANTED Defendant's Motion to Dismiss Plaintiff's claims for negligent interference with prospective economic relations and negligent misrepresentation; and

3) The court took under advisement Defendant's Motion to Dismiss Plaintiff's breach of contract claim.

Since the hearing, Plaintiff has submitted a Notice of Supplemental Authority to support its breach of contract claim. (Dkt. 41.) Defendant filed an Objection and Response (Dkt. 42) to Plaintiff's Notice. The court now memorializes its rulings from the bench, and also rules on Defendant's Motion to Dismiss Plaintiff's breach of contract claim, concluding that the Motion must be DENIED.

## FACTUAL BACKGROUND[1]

Quarry Village Associates (QVA) obtained three loans from Barnes Bank in 2006.[2] First, in June 2006, QVA took a loan in the amount of $5.5 million. QVA executed a trust deed in favor of Barnes Bank on June 23, 2006. That deed was recorded on June 29 in the Summit

---

[1] The Factual Background is taken from the allegations in Plaintiff's Second Amended Complaint. (Dkt. 28.)

[2] Plaintiff notes in its Second Amended Complaint that there was a also fourth loan from Barnes Bank, but that loan is irrelevant to the allegations in the Second Amended Complaint. (Dkt. 28 at ¶ 25.)

County Recorder's Office. In July 2006, QVA took a second loan in the amount of $378,000. A second trust deed in favor of Barnes Bank was executed on July 12, 2006, and recorded the following day. In September 2006, QVA opened a line of credit for an amount up to $5,040,000, evidenced by a Promissory Note dated September 19, 2006. On September 19, 2006, QVA executed a construction trust deed in favor of Barnes Bank (September 2006 Loan). The deed was recorded on September 21, 2006.

Notwithstanding the June and July 2006 deeds of trust, on September 21, 2006, Barnes Bank obtained the Policy—a lender's policy of title insurance—from the Defendant, insuring the first priority lien position of the September 2006 Loan. The title commitment Defendant issued lists the June 2006 Deed as an exception. The Policy that Defendant ultimately issued, however, shows no deeds of trust as exceptions recorded against the property prior to the September 2006 Loan.

Four years later, in 2010, the FDIC was appointed as receiver for Barnes Bank. The June and July 2006 loans were eventually assigned to Cache Valley Bank (CVB). The September 2006 Loan passed among various entities. In November 2010, the interest in the September 2006 Loan was held by SFR VENTURE, LLC (SFR). A year later, on November 21, 2011, SFR assigned its interest in that loan to Lutetium Holding Company, LLC (Lutetium).

Later, Plaintiff began negotiations with Lutetium to purchase the interest in the September 2006 Loan. Plaintiff made a number of inquiries as part of its due diligence. First, Plaintiff "inquired as to the trustee of the loans, the lien position, the foreclosure status, and any other title information." (Dkt. 28 at ¶ 45.) Lutetium responded that the "liens are in first position and are insured." (*Id.* at ¶ 46.)

Plaintiff also obtained on February 12, 2012, a Limited Report (Limited Report) from Cottonwood Title Insurance Agency (Cottonwood).  (Dkt. 28 at ¶ 47.)  The Limited Report showed the June and July 2006 trust deeds held by CVB (CVB Trust Deeds).  (*Id.* at ¶ 49.)  Plaintiff asked Cottonwood about the Limited Report.  Cottonwood suggested that the Limited Report must be mistaken, since the CVB Trust Deeds were not listed on the Policy Defendant had issued insuring the first lien position of the September 2006 Loan.  Plaintiff was also aware that preliminary reports, like the Limited Report, are "often erroneous."  (Dkt. 28 at ¶ 55.)

Plaintiff then asked Lutetium about the CVB Trust Deeds.  (Dkt. 28 at ¶ 51.)  Lutetium told Plaintiff that the CVB Trust Deeds were "invalid or a mistake" because the Policy issued by Defendant listed no exceptions.  (*Id.* at ¶ 52.)

Finally, Plaintiff reviewed the Policy of title insurance Defendant issued.  Plaintiff observed that the CVB Trust Deeds had been removed and were not listed as exceptions.  (Dkt. 28 at ¶ 54.)

On February 17, 2012, Lutetium assigned its interest in the September 2006 Loan to Plaintiff.  The assignment instrument was recorded in Summit County on February 22, 2012.  That same day, Plaintiff learned from QVA and QVA's attorneys that "CVB claimed the CVB Trust Deeds were valid."  (Dkt. 28 at ¶ 56.)

In response, Plaintiff contacted one of Defendant's representatives, and was given a copy of the relevant loan file, the June 2006 trust deed, and the Policy.  Plaintiff also obtained a copy of the closing file pertaining to the June 2006 loan.  That file contained a title commitment showing the CVB Trust Deeds.  But an entry about the trust deeds had been marked out by one of Defendant's agents, with the notation "*pd internally w/closing*" handwritten beside it.  (Dkt. 28 at ¶¶ 57-63.)

On February 29, 2012, Plaintiff made a claim under the Policy related to the CVB Trust Deeds. (Dkt. 28 at ¶¶ 67-68.) Around this time, QVA defaulted on its September 2006 loan and Plaintiff initiated non-judicial foreclosure proceedings. QVA and Plaintiff entered into a Deed in Lieu of Foreclosure agreement. (Dkt. 28 at ¶¶ 30 and 66.) QVA delivered the deed to Plaintiff, and it was recorded on June 28, 2012. As a result, Plaintiff held fee simple ownership to its property. (*Id.* at ¶¶ 31-32.)

Between March and July 2012, Plaintiff sought payment from Defendant on Plaintiff's insurance claim. All the while, CVB was advancing foreclosure proceedings against Plaintiff's property. CVB scheduled a trustee's sale for May 22, 2012. Defendant did not take action to stop the proceedings. Plaintiff hired counsel, who managed to cancel the sale on technical grounds. (Dkt. 28 at ¶¶ 36-37.) On May 22, 2012, CVB recorded a new Notice of Default. (Dkt. 28 at ¶ 38.)

Plaintiff filed suit on July 30, 2012. At that time, Plaintiff claimed that it had received three offers to buy its property, but had to let each lapse due to the cloud on title presented by the CVB Trust Deeds and CVB's attempted foreclosure. (Dkt. 28 at ¶¶ 42-44.)

CVB scheduled a new trustee's sale for October 4, 2012. On October 3, 2012, Defendant informed Plaintiff that it was denying Plaintiff's title insurance claim under the Policy, and would take no action to prevent the sale. Plaintiff then entered into discussions with CVB, resulting in Plaintiff purchasing the 2006 loans from CVB for $1,623,000. (Dkt. 28 at ¶¶ 76-81.)

**DISCUSSION**

I.   **Legal Standards**

Defendant moves the court under Rule 12(b)(6), Federal Rules of Civil Procedure, for an order dismissing Plaintiff's Complaint for failure to state a claim upon which relief may be granted. When evaluating Defendant's motion, the court accepts Plaintiff's well-pled allegations as true and views them in the light most favorable to Plaintiff, the nonmoving party. *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002). To survive Defendant's Motion to Dismiss, Plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Plaintiff's claims relate to the Policy of title insurance issued by the Defendant. Under Utah law, title insurance is meant to indemnify an insured for losses suffered "by reason of defects in the title to the property or by reason of liens or encumbrances on the property itself." *Valley Bank and Trust Co. v. U.S. Life Title Ins. Co*., 776 P.2d 933, 935-36 (Utah Ct. App. 1989) (citations omitted); *see also Breuer-Harrison, Inc. v. Combe,* 799 P.2d 716, 729 (Utah Ct. App. 1990) ("Title insurance is a contract to indemnify the insured against loss through defects in the insured title or against liens or encumbrances that may affect the insured title at the time the policy is issued.") (quoting *Malinak v. Safeco Title Ins. Co. of Idaho*, 661 P.2d 12, 14 (Mont. 1983)). In Utah, title insurers are to conduct reasonable title searches before writing policies:

> No title insurance policy may be written until the title insurer or its agent has conducted a reasonable search and examination of the title and has made a determination of the insurability of title under sound underwriting principles.

UTAH CODE ANN. § 31A–20–110(1).

Despite this duty, Utah courts have generally held that title insurers are not liable in tort for errors relating to title, and the law does not impose on them a "duty to abstract titles…." *Chapman v. Uintah County,* 81 P.3d 761, 765-66 (Utah Ct. App. 2003) (citing *Culp v. Buildmart Mall,* 795 P.2d 650, 654 (Utah 1990)). "The function, form, and character of a title insurer is different from that of an abstractor. One who hires a title insurance company does so for the purpose of obtaining the assurance or guarantee of obtaining a certain position in the chain of title rather than for the purpose of discovering the title status. A title insurance company's function is generally confined to the practice of insurance, not to the practice of abstracting." *Id.* at 766 (citing *Culp*, 81 P.3d at 654).

Illustrative of these principles, the Utah Court of Appeals has declined to impose tort liability on a title insurer when it issued a policy misleading the insured into believing the road next to his property was a private road attached to the property. *Chapman*, 81 P.2d 761. In *Chapman*, the court noted that the plaintiff's claim that the insurer "is liable in tort, similar to an abstractor, for its error in representing the title in the insurance commitment and policy is not supported by our case law." *Id.* at 766.

Rather, claims against title insurers will typically sound it contract. The Utah Supreme Court explains that "[a] title insurance policy, like other insurance policies, serves as a contract between the insurer and the insured, and as such is subject to the general rules of contract construction." *Holmes Development, LLC v. Cook*, 2002 UT 38 ¶ 24, 48 P.3d 895, 902 (Utah 2002) (citations omitted). "Thus, unless the language of the policy is ambiguous or unclear," a court "construe[s] it according to the policy's plain and ordinary meaning." *Id*. (citations omitted). Individual provisions of the policy should be construed "in light of the policy as a whole." *Id*. (citations omitted). "However, policy provisions excluding coverage are strictly

7

construed against the insurer and in favor of the insured." *Valley Bank*, 776 P.2d at 936 (citations omitted).

## II.  Defendant's Motion to Dismiss

### A.  Plaintiff's Breach of Contract Claim

Plaintiff is an insured under the Policy of title insurance Defendant issued.[3]  Plaintiff alleges that Defendant breached the Policy terms by its failure to promptly accept Plaintiff's claim under the Policy, and its refusal to insure the first lien position of Plaintiff's September 2006 Loan.

Defendant contends there is no coverage for Plaintiff under the Policy.  Defendant relies upon an exclusion in the Policy that precludes coverage for any losses that "arise by reason of…[d]efects, liens, encumbrances, adverse claims or other matters … created, suffered, assumed, or agreed to by the Insured Claimant."  (Dkt. 28-5, the Policy, at 3.)  The term "Insured Claimant" is defined as "an insured claiming loss or damage."  (*Id.* at 3.)  Defendant contends there can be no coverage under the Policy for losses related to the CVB Trust Deeds not listed in the Policy issued by Defendant because an Insured Claimant created those liens in the first instance.

Plaintiff, although presumably an "Insured Claimant," did not "create[], suffer[], [or] assume[]" the liens now held by CVB.  Barnes Bank, a predecessor insured, did.  Defendant nevertheless endeavors to apply the above-referenced exclusion to Plaintiff by relying on other Policy language providing that Defendant reserves "all rights and defenses as to any successor that [Defendant] would have against any predecessor insured, unless the successor acquired the

---

[3] The Policy defines "Insured" to include "the owner of the Indebtedness [Barnes Bank] and each successor in ownership of the Indebtedness…."  (Dkt. 28-5 at 3.)

Indebtedness as a purchaser for value without Knowledge of the asserted debt, lien, encumbrance, or other matter insured against this policy." (Dkt. 28-5 at 3.)

Plaintiff does not contest that it is a successor under the Policy, or that it acquired the September 2006 Loan as a purchaser for value. The disputed issue here is whether Plaintiff had knowledge of the CVB Trust Deeds when Plaintiff purchased the September 2006 Loan from Lutetium in February 2012. The Policy defines the term "Knowledge" as "actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting Title." (Dkt. 28-5 at 3.)

Defendant contends that Plaintiff gained the requisite "actual knowledge" of the prior "asserted. . . . liens," the CVB Trust Deeds, when it reviewed the preliminary Limited Report from Cottonwood Insurance showing them. Plaintiff responds that it did not have knowledge that the CVB Trust Deeds encumbered the loan property because after it reviewed the Limited Report, others from Cottonwood and Lutetium assured Plaintiff that those liens were invalid or mistaken, and directed Plaintiff to review the Defendant's Policy, which did not list the CVB Trust Deeds as exceptions. Defendant replies that Plaintiff's interpretation improperly reads into the Policy the phrase "valid lien" rather than "asserted . . . lien." According to Defendant, Plaintiff had actual knowledge of the asserted liens, and questions about the validity of those liens did nothing to save Plaintiff from its knowledge that the liens had been asserted.

At the motion to dismiss stage, the court must accept as true Plaintiff's well-pled allegations and must view them in a light most favorable to Plaintiff. The court cannot conclude on the basis of the allegations in the Second Amended Complaint that Plaintiff had "actual knowledge" of the prior asserted liens, the CVB Trust Deeds, as opposed to "constructive

knowledge or notice . . . by reason of . . . . records that impart constructive notice of matters affecting Title." (Dkt. 28-5 at 3.) Rather, the allegations in the Second Amended Complaint adequately support an inference that Plaintiff disbelieved that any prior asserted liens existed at the critical time under the Policy terms–when Plaintiff "acquired the indebtedness."

In the Second Amended Complaint, Plaintiff alleges that it learned of the CVB Trust Deeds through an unreliable source—a preliminary Limited Report. Plaintiff alleges that this sort of report is "often erroneous." (Dkt. 28 at ¶ 55.) Plaintiff then further investigated the information contained in the Limited Report to its satisfaction, confirming (it believed) that the listed liens were not, in fact, liens that would affect its first position loan. Plaintiff learned from Cottonwood and Lutetium that the liens were "invalid" or "mistaken." Cottonwood and Lutetium directed Plaintiff to the Policy issued by Defendant, which did not list the CVB Trust Deeds as exceptions. Even assuming that the preliminary Limited Report imparted to Plaintiff actual knowledge of the prior asserted liens, Plaintiff's allegations concerning its subsequent investigation support an inference that any "actual knowledge" of the liens was vitiated by the time it acquired the loan. Under the circumstances alleged, Plaintiff's decision to proceed with the loan purchase after its due diligence strongly supports an inference that Plaintiff lacked actual knowledge of any liens that could impair its title when Plaintiff acquired the indebtedness.

Still, Defendant contends for two reasons that despite the later-received assurances and Policy mistakes, Plaintiff must have had actual knowledge of the CVB Trust Deeds because it saw the Limited Report showing them. First, citing Utah Code Annotated Section 57-1-40, Defendant notes that under Utah law, a lien remains an "encumbrance of record" until the trustee under the trust deed records a reconveyance. (Dkt. 40 at 3-4.) Thus, according to the Defendant, the CVB Trust Deeds on the Limited Report remained "an asserted lien. . . because a full

reconveyance had never been recorded," and Plaintiff's due diligence "does not change the fact that Plaintiff was aware that a full reconveyance had not been recorded against the Property. . . ." (Dkt. 40 at 4.)

Defendant's argument requires the court to make factual leaps that it may not make at this time—to find that Plaintiff's awareness that an "often erroneous," preliminary Limited Report listing prior liens necessarily means that Plaintiff knew that the trustee under the trust deed had not recorded a reconveyance. Defendant's argument runs counter to the allegations in the Second Amended Complaint, which must be accepted as true at this stage of the proceeding. Defendant's argument also hinges on inferences the court may not properly draw under Rule 12(b)(6). The allegations set forth in the Second Amended Complaint do not suggest that Plaintiff had actual knowledge that a trustee had not in fact recorded a reconveyance. Rather, the facts suggest that Plaintiff was at least ignorant of that fact, and thought that regardless of what the Limited Report showed, the CVB Trust Deeds listed were invalid, mistaken, paid, or would otherwise not affect Plaintiff's title. Plaintiff received verbal assurances to that effect, and viewed a clean title Policy prepared by an insurer required by Utah law to conduct a search before issuing that Policy. *See* UTAH CODE ANN. § 31A–20–110(1) (insurer required to conduct a reasonable search).

Next, Defendant contends that Plaintiff's initial "actual knowledge" of the liens cannot be erased by the "hearsay"[4] from Cottonwood and Lutetium. (Dkt. 40 at 4.) The thrust of Defendant's argument is that despite receiving assurances from Cottonwood, Lutetium, and

---

[4] The verbal assurances offered by Cottonwood and Lutetium are not hearsay. They are not offered for the truth of the matter asserted—that the liens were in fact mistaken or invalid. Plaintiff does not appear to allege that the liens were mistaken or invalid. Rather, the assurances appear to be offered to explain Plaintiff's understanding of the Limited Report showing the liens and why Plaintiff relied upon the Policy issued by Defendant, which did not show the liens.

11

Plaintiff's review of the title Policy itself, Plaintiff's knowledge of the CVB Trust Deeds should have prompted additional inquiry.  As Defendant states, "Prior to purchasing the Second Loan, Plaintiff reviewed a title report and saw the First Deed of Trust was a lien and encumbrance of record against the Property, and that the First Deed of Trust had never been reconveyed.  The inquiry to actual knowledge ends there."  (Dkt. 40 at 5.)

There are two problems with this argument.  The first is a matter of timing—when the inquiry into Plaintiff's actual knowledge should focus.  Contrary to Defendant's suggestion that the inquiry ended when Plaintiff viewed the preliminary Limited Report, Defendant's own Policy states that this inquiry ends when the Plaintiff "acquired the indebtedness," or purchased the September 2006 Loan.  (Dkt. 28-5 at 3.)  Here, Plaintiff "acquired the indebtedness" after Plaintiff had not only viewed the Limited Report from Cottonwood, but also after Plaintiff received subsequent assurances from others that the CVB Trust Deeds would not impair its title, and after viewing the Policy issued by the Defendant, which did not list those liens as exceptions.

The relevant case law is sparse, and generally not very helpful.  But the court finds a decision from the Oregon Court of Appeals instructive.  In *Dimeo v. Gesik*, the court confronted a set of facts somewhat analogous to those here, and held that information obtained after reviewing a preliminary title report was relevant to determining whether a lender had actual knowledge of liens listed in the preliminary report, but absent in a subsequently-issued title report. 164 Or. App. 567 (1999).  In *Dimeo*, Western Bank offered Gesik a large home equity line of credit, conditioned on the issuance of a title insurance policy showing the bank's loan in first position.  *Id.* at 569-70.  But multiple properly-recorded liens were already secured by the home, including a lien held by a Dimeo.  *Id.*  The bank obtained a preliminary title report showing the Dimeo lien and one other.  *Id.* at 185.  In response to questions about the

preliminary report, a bank manager was assured by the title company that the other liens would have to be subordinated to the bank's liens, or otherwise removed. *Id.* Later, the bank received a title report showing its loan in first position, with no reference to the other liens. *Id.* at 570. The bank then disbursed the funds to Gesik. *Id.* When Dimeo later sought to foreclose on his loan, the bank counterclaimed, asserting that it had a superior position under the doctrine of equitable subrogation. *Id.* The bank's reliance on this doctrine required it to show that it was "ignorant of the existence of the intervening lien and that its ignorance was not a result of inexcusable negligence." *Id.* at 571 (citations omitted). The trial court granted summary judgment in Dimeo's favor. The bank appealed.

The issue on appeal was whether, as a matter of law, the bank was excusably ignorant of the prior liens. The parties' there advanced arguments similar to those offered here:

> There is no dispute that Western Bank initially had actual knowledge of the liens. The preliminary title report revealed the existence of the liens. The bank manager even called a representative of the title company to talk about the necessity of obtaining the discharge of the liens. Not surprisingly, therefore, Western Bank concedes that it had actual knowledge of the liens, at least as of the time of the receipt of the preliminary title report. Western Bank nevertheless argues that, *at the time that it released the funds,* it was ignorant of the intervening liens, because it had instructed the title company to make sure that the liens were either paid or subordinated, and because, consistent with those instructions, a final title report made no mention of the liens. . . . Western Bank argues that it is routine for lenders to rely on final title reports that provide different information from what was provided in a preliminary title report.

*Id.* at 571.

As Defendant does in the present case, Dimeo argued to the Oregon Court of Appeals "that, as a matter of law, the bank's actual knowledge of the intervening liens cannot have been, in effect, erased by the subsequent title report." *Id.* According to Dimeo, the bank was grossly negligent in relying on a subsequent title report that did not explain what had happened to the intervening liens. *Id.* The Oregon Court of Appeals rejected Dimeo's argument and concluded

13

that factual issues concerning the reasonableness of the bank's ignorance at the time it disbursed the loan precluded summary judgment. The court reversed the trial judge's grant of summary judgment on that basis. Defendant's argument here is similarly unavailing.

In addition to incorrectly attempting to conclude the inquiry into Plaintiff's knowledge prematurely, Defendant's argument here also seems to convert the relevant inquiry into constructive knowledge or notice inquiry. But that is not the correct test. Neither the Policy language nor Utah law impose upon Plaintiff an affirmative duty to ascertain whether liens existed which might affect title. Under the Policy, the court must evaluate Plaintiff's "actual knowledge" at the time of the loan purchase, "not constructive knowledge . . . that may be imputed . . . by reason of the Public Records or any other records that impart constructive notice of matters affecting Title." (Dkt. 28-5 at 3.) Similarly, the Utah Supreme Court has stated that "the insured is not required to perform the insurer's duty to ascertain the validity of the title." *Zions First Nat. Bank, N.A. v. National American Title Ins. Co.*, 749 P.2d 651, 653 (Utah 1988) (citing *Bush v. Coult,* 594 P.2d 865, 867 (Utah 1979)).

Ironically, had Plaintiff failed to perform any due diligence, it would certainly have lacked actual knowledge of prior liens, and there would be no argument supporting the Defendant's application of the Policy exclusion. Instead, Plaintiff has alleged that it conducted reasonable investigation, first obtaining evidence of the CVB Trust Deeds on an unreliable, preliminary report and thereafter gaining confirmation from three sources that there were no liens on the property. Plaintiff may have been on constructive notice of the liens, but, reading the allegations in a light most favorable to Plaintiff, it may not have had actual knowledge. The court also observes that, taken to its logical conclusion, Defendant's argument yields the

nonsensical result that Plaintiff is simultaneously charged with "actual knowledge" both that prior liens are asserted and that they have been extinguished. Of course, that cannot be so.

Accepting as true the facts alleged in the Second Amended Complaint, together with all reasonable inferences drawn from those facts, the court concludes that Plaintiff has adequately stated a plausible claim for breach of contract.

### B. Plaintiff's Claim for Breach of Implied Covenant of Good Faith and Fair Dealing

Citing *Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524 (Utah 2002), Defendant argues that the court should dismiss Plaintiff's claim for breach of the covenant of good faith and fair dealing inherent in the parties' contract—the Policy—if, ultimately, 1) there is no coverage under the Policy, or 2) if Defendant's coverage denial is "fairly debatable" under Utah law. Defendant is correct that under Utah law, the implied covenant of good faith and fair dealing cannot create rights and duties inconsistent with the express terms of a contract. *Anapoell v. American Express Bus. Fin. Corp.*, 2008 WL 2225849, at *6 (D. Utah May 28, 2008) ("…the implied covenant may not be interpreted to make a better deal for the party than he made for himself." (citations omitted). Further, under *Prince,* a denial of claim is not 'bad faith' if that coverage denial was "fairly debatable." 56 P.3d at 533-34 ("denial of a claim is reasonable if the insured's claim is fairly debatable"). *Prince,* a case arising in the PIP insurance context, did not discuss an insurer's alleged delay in conducting an investigation or making an eventual coverage decision.

But Plaintiff's breach of the covenant of good faith and fair dealing claim goes beyond whether Defendant's coverage denial decision itself was fairly debatable—and thus beyond what *Prince* addressed. Plaintiff's Second Amended Complaint contains allegations stemming from the allegedly unreasonable length of time Defendant took to evaluate Plaintiff's claim, and the

damaging timing of Defendant's eventual denial—the night before the scheduled trustee's sale. Plaintiff also asserts that Defendant should have accepted Plaintiff's claim under a reservation of rights, among other allegations. (Dkt. 28 at ¶¶ 96-117.)

Under Utah insurance law, even in a first party insurance context, "the implied obligation of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985) (citations omitted). As the Utah Supreme Court has observed:

> These performances are the essence of what the insured has bargained and paid for, and the insurer has the obligation to perform them. When an insurer has breached this duty, it is liable for damages suffered in consequence of that breach.

*Id.* Thus, independent duties to investigate diligently and promptly make a coverage determination apply even if the insurer will eventually reject the claim.

Plaintiff has alleged breaches of these duties and others. Plaintiff's claim for breach of the covenant of good faith and fair dealing survives Defendant's Motion to Dismiss.

### C. Plaintiff's Tort Claims for Negligent Interference with Prospective Economic Advantage and Negligent Misrepresentation

As discussed above, Utah courts hesitate to charge title insurers with general professional tort duties, and generally find that claims against title insurers for inaccuracies in commitments and policies sound in contract. *See, e.g., Chapman,* 81 P.3d 761. Title insurers contract to provide insurance coverage, not binding representations concerning chain of title. If a chain of title is incorrectly stated, and if there is coverage, the insurer must insure. But under Utah law, title insurers do not have a duty to present an accurate abstract of title on which others should be entitled to rely. Against the backdrop of cases like *Chapman*, the court considers Plaintiff's tort

claims, and finds that they must fail.  At oral argument, counsel for Plaintiff agreed that under Utah law, its tort claims are infirm and should be dismissed.[5]

## CONCLUSION

Based upon the foregoing, the Defendant's Motion to Dismiss (Dkt. 29) is GRANTED IN PART and DENIED IN PART as follows:

1) Defendant's Motion to Dismiss Plaintiff's claim for breach of contract is DENIED WITHOUT PREJUDICE;

2) Defendant's Motion to Dismiss Plaintiff's claim for breach of the covenant of good faith and fair dealing is DENIED WITHOUT PREJUDICE;

3) Defendant's Motion to Dismiss Plaintiff's claims for negligent interference with prospective economic relations and negligent misrepresentation is GRANTED.

It is so ORDERED.

Dated this ___2nd___ day of __December__ 2013

BY THE COURT

Robert J. Shelby
United States District Court

---

[5] Further, Defendant correctly notes in its briefing that "doctrine of economic loss" bars Plaintiff from asserting a tort claim in this case, which arises out of a contract, unless it can point to an independent, non-contractual duty Defendant owed Plaintiff.  *Gallagher v. Alliance Bancorp*, 2011 WL 2789935 at * (D.Utah July 13, 2011) (dismissing homeowner Plaintiffs' negligent misrepresentation claims against  mortgage loan defendants on grounds that in an arms-length transaction there is no duty to disclose and under economic loss rule where claims "arise out of contract and are, therefore, barred….") (citing *Grynberg v. Questar Pipeline Co.*, 70 P.3d 1, 12 (Utah 2003)).  Here, the parties' relationship is governed by a contract—the Policy.  As such, tort claims are barred absent an independent, non-contractual duty.  None is alleged.